Mr. Oak, whenever you're ready Good morning, Your Honors, and may it please the Court. My name is Robert Oak, and I represent New World International and National Auto Parts on this appeal. I'd like to reserve five minutes for rebuttal. This is a patent declaratory judgment action that involves two issues on appeal. The first is whether the District Court erred in dismissing the case for lack of specific personal jurisdiction. And then the second issue is whether the District Court abused its discretion in refusing to allow a motion for leave to amend the complaint after the case was dismissed. So first, the jurisdictional issue. This Court uses a three-part test for determining whether specific personal jurisdiction exists in the case. First, the defendant must purposefully direct activities toward the forum. Now, we're familiar with the test. You might want to get right to the core issue here, which is really, as I see it, and you can argue it the way you want, but it's whether the series of cases, starting with the one that was sent, really help you or whether they're distinguishable in a way that helps your opponent. Yes, Your Honor, I agree that is the key issue of the case. Let's get right to it. In this case, cease and desist letters were sent, and those would satisfy the two first elements of the three-part test, the so-called minimum context test. However, under this Court's policy, under the Red Wing case, because a patentee is allowed to provide notice, as a matter of policy, this Court says the demand letters are not enough. So what this Court is looking for is something more than the demand letters, and that is why we have such focus on the exclusive license agreement in this case, because in Breckenridge, this Court said that when you have a demand letter sent and you have an exclusive license agreement, then the license agreement should be clear. There are distinctions between this case and Breckenridge, right, in terms of the nature of the exclusive license that was entered into? In terms of the facts, the facts are not exactly the same, however, the underlying principles are the same. In Breckenridge, they said the license agreement should be closely examined, and so the question is, for what? Why should the license agreement be closely examined? And this Court said that it must be examined for whether it obligates the defendant beyond the mere receipt of royalty income that relates to the enforcement or defense of the patent. That is what this Court says. But the whole thing isn't, therefore, anything and everything that's beyond that means that there's jurisdiction, right? I mean, that seems to beg the question to me. Yes, Your Honor. It can't be anything and everything. It must relate to the enforcement and defense of the patent. But what this Court is looking for is a continuing obligation. Particularly an obligation, as in Breckenridge and discussed in Avocent, an obligation to bring suit against infringers or a provision in the contract that allows the licensee to bring suit. And neither of those is present in this case, except to the extent that there is this reasonableness requirement that goes along with the decision by the patentee not to bring suit for any reasonable reason. So that, you know, when you look at the language of Breckenridge, Breckenridge talks about if the license agreement requires the defendant licensor and grants the licensee the right to litigate infringement. That's not present here, as far as I can see. So why isn't that case, at least, distinguishable on that ground? Well, actually, I believe in Breckenridge, the duty on enforcement between the licensor and the licensee was to discuss in good faith and cooperate reasonably. That is what the license agreement says. But the authority to sue was in the licensee. It is, the licensee could bring the action subject to the duty of good faith of the patentee to cooperate with the licensee, which is necessary in any case when you have an exclusive license. You've got to have the patentee and you've got to have the licensee. Well, correct. And, but in this license agreement we have in this case, you also have authority for both the licensor and licensee. Where's the authority for the licensee to enforce? I didn't see that. I thought that Wright was entirely in the patentee to enforce, subject to the reasonableness clause. Am I wrong about that? Yes, Your Honor. I am wrong? With respect, yes. I believe you are. All right. Paragraph 8.2, it states with Ford Global's prior written consent, LKQ may handle the suits as agreed upon. And that would certainly include, as I've argued in the brief, that would embrace a counterclaim for patent infringement. What provision are you? Paragraph 8.2. Those are suits by third parties, as I understand it, against LKQ, not suits by LKQ on the patent. That's what I'm talking about, is what powers, if any, does LKQ have to enforce the patent? And I don't think LKQ has any such power, except to the extent that you say, well, the reasonableness clause gives it some control over the decision of the patentee, whether to sue or not. Am I wrong about that? I think I'm not. I think you have to. Well, let's make sure we are on the same page with respect to the facts. Is that true, that that's the limit of LKQ's power to sue for infringement? That is to say it can't, and the only thing it has is the reasonableness clause to hang its hat on. Is that right? Well, I would interpret 8.2 as including the right to bring a counterclaim in the context of that provision. If somebody is suing LKQ related to the products that it's selling, and LKQ is handling that situation, I would argue that in the context that LKQ could bring a counterclaim for patent infringement based on the Ford Global Patents. I would argue that 8.2 is broad enough to encompass that, but you also have 10.1. Wait, 8.2, it says with Ford's prior written consent. Correct. 8.2. But that wouldn't even come up unless somebody else was suing LKQ for infringing their patent. And it would seem to me an unusual case, to say the least, that LKQ would then say, well, you know, we're not infringing your patent, but oh, by the way, you're infringing Ford's patent. Well, but it's all embraced in the right to enforce these patents. You also have paragraph 10.1, which says that LKQ must take reasonable steps to ensure that no manufacturer sells products in the territory, 10.1. Are you familiar with Zilnick's from last month? Yes, Your Honor. I want you to discuss the distinctions that were drawn by that case where they looked at, for example, the burden on PAPS mitigated by its status as a non-practicing patent holder and specifically that it filed suit seven times in the California judicial system. That's an awful lot. Well, yes, Your Honor, but that goes back to the framework of how this court deals with personal jurisdiction. Once the two minimum contacts are satisfied, then the burden shifts to the defendant to And in the PAPS case, you only had, again, and I would argue the Zilnick's case supports the argument that we're arguing for here. You're just looking for an additional factor because the only additional factor that related to the enforcement and defense of the particular patents in Zilnick's was the trip and the status as a non-practicing entity did not directly relate to the patents in suit and also the prior suits that were filed. Those were filed on different patents, and they did not specifically relate to the patents in suit, so you only had one additional factor in Zilnick's. You only had the trip into the state, and that's what we're saying. You're just looking for one additional factor. You should not look at the tests that the district court tried to use, which we believe is error, is you're looking for overall business integration and coordination. That is too much. You're just looking for one additional factor, which satisfies the minimum contacts, triggers the burden on the defendant, then to come forward with a compelling case, which they have not done in this case. I would go back to, we also have an indemnification agreement in the licensing agreement. You didn't raise that until your reconsideration motion, if I recall correctly, isn't that right? Your Honor, kind of the timeline of this case. Let's see if we can get an answer first, and then you can explain. Okay. I raised, in the response, I raised the licensing agreement, the issue of the licensing agreement. The problem was it was, I explained it in the brief, it was attorney eyes only. I referenced it in support of personal jurisdiction, but we did not get into the specifics of it. Again, in this case, we do have the continuing obligations in the licensing agreement. We have the must not unreasonably refuse, which we believe brings it within the context of Breckenridge. We have the indemnity obligation, brings it within the context of genetic implant. We believe the court should just be looking for an additional factor rather than this overall relationship. In addition to the Xilinx case, which we've talked about, I would also point out that in the accurate- I fail to see how it supports you. Pardon me? I said I fail to see how it supports you. You're going to have to convince me more. Don't say we've talked about it because you're not there yet. Well, then let me say that to my direct point, that you're just looking for an additional factor. Of course, what we're trying to do is satisfy due process. It's in Burger King. We're looking for something that is not- That an additional factor was seven times they utilized the federal courts in California. You can say that's on different patents. That's irrelevant. Your Honor, with respect, I believe that the court was looking at that issue on the overall reasonableness and fairness. In the Xilinx case, I believe the court was focusing in on- In fact, the court states the issue in this case is whether it's fair and reasonable. When you look at the fair and reasonableness prong, you can look at all the other factors that are not just directly related to the patent and suit. You can look at all the other factors. I would also state that in the ACRO case, really the first case that started the series of cases, you had demand letters and an exclusion. In ACRO, the licensee was a resident of the form state. That's not close to being the case here. In later cases, this court has held that that doesn't matter. It just matters if the licensee is doing business in the form state. I know, but you were just talking about ACRO, so I just thought I'd remind you why I think ACRO is really not supportive of your position here. I was citing ACRO just for the simple proposition that the court was looking for one additional factor and cited the obligation to enforce in the license agreement and did not focus on the overall relationship between the parties. Just very briefly, and this is sort of off point and I realize that, but this is a case in which your cause of action has not been extinguished. Judge Lynn has just said go somewhere else, specifically, I suppose, the Eastern District of Michigan, and yet you've spent a lot of time and presumably money fighting over whether it's Judge Lynn or equally, well, she's very good, so maybe not equally capable, but a very capable judge in the Eastern District of Michigan. Why is that so important to you? Well, Your Honor, there are a lot of factors that go into choice of forum, and there are a lot of issues in this case. There are other companion cases that are pending that are focusing in on different areas of repair parts for vehicles should be covered by design patents and whether design patents on those parts are valid and enforceable and whether my clients have willfully infringed these patents. Obviously, and again, citing some of the reasonableness factors, the state of Texas probably purchases more of these Ford F-150 repair parts than any other state in the union. And the state of Texas has a real interest in determining whether these patents are valid or not. Do you think you can get a better jury in the Northern District of Texas? You prefer the jury you get? Is that it? Well, Your Honor, again, there are many factors. Okay, it really isn't directly relevant. Okay, well, my client is located in the Northern District of Texas. All right. And yes, all right. So I didn't get to the other issues, but I would just rest on the briefs. Okay, and while we stir a couple minutes of rebuttal, we'll take it from the other side. Thank you, Your Honor, and may it please the Court. Sean Murata for Ford Global Technologies. I'll jump right into the cases. We'll want to just jump right into Breckenridge, because that seems to be the closest. Absolutely. So Breckenridge was one of those cases that courts often see where it says, you know what? We have a lot of prior case law that points in different directions. So let's try to crystallize it. Let's try to break it down and come up with some sort of standards of law that are going to help cases in the future. And here's what the court said. The inquiry requires close examination of the license agreement. In particular, our case law requires that the license agreement contemplate a relationship beyond royalty or cross-licensing payment, such as granting both parties the right to litigate infringement cases or granting the licensor the right to exercise control over the licensee's sale or marketing activities. We have none of that here. As was discussed earlier, LKQ does not have the right to enforce the patents in suit. And what Section 8.2 says is pretty clear. It says that if a claim, demand, or suit is asserted against LKQ based on the use of the design patents, LKQ, with Ford Global's written consent, may handle such claim where such claim refers back to the claim that is asserted against LKQ in a manner, you know, deemed consistent between... Wait a minute. Am I wrong? In Breckenridge, didn't the licensee need the licensor's consent? Yes, but needed the licensor's consent to bring an infringement suit. In this case, what LKQ needs is Ford Global's written consent to even defend a suit asserted against it based on its use of the design patent. Under the license, LKQ has no right to bring infringement. Ford Global is the only one who can bring an infringement suit. But there is a limitation on Ford Global's complete discretion whether to sue or not. And it's the reasonableness limitation. To me, that seems to be a hook that you need to explain why that doesn't make the two parties effectively partners in the enterprise of deciding whether to sue. Sure. So I think there's two things. One is that Breckenridge says that both parties have to have the right to assert patent infringement. So we say LKQ doesn't have the right to institute infringement suit. Stop there. But even if you want to look at 8.1... I think that's maybe a little bit of an aggressive reading of Breckenridge. Because as I understand the way the law is developed, if the patentee gives the licensee the authority to sue with an agreement to consent, then that's the equivalent of the patentee and the licensee both having the right to sue. You wouldn't disagree with that, I don't think. I would agree that if the licensor says licensee, you may sue with our written consent. Yes, that would be a power in the law. Okay. So it really is only the licensee that needs to have the power to sue. Yes. So we don't have to worry about whether the licensor has retained the right. So the question then is, what about this reasonableness requirement? What do you say about that? Sure. What we say about it is you need to read the reasonableness clause in light of everything that comes before. It's that Ford Global has the absolute discretion, except that it shall not unreasonably refuse. So in other words, it's a reason-giving requirement. It says that Ford Global, if you don't want to bring suit on these patents, that's fine. You just can't do it as a matter of personal whim or caprice. Or you can't say, well, it's Tuesday and we don't feel like suing on these patents. You have to give some sort of commercial reason for not bringing suit. And one of the reasons that Ford Global might not want to do that is it doesn't want to engage in enforcement activities in the Eastern District or Northern District of Texas, which, as my friend pointed out, has certain attributes attached to it that licensors, which, by the way, Ford Global- Or it doesn't think it's worth spending the money. Absolutely. I mean, there are any number of commercial reasons, but I point out that Ford Global is quite often more a patent defendant than it is a patent plaintiff. So it might reasonably say, particularly, by the way, in light of Zilnick's, you know what? The federal circuit is going to hold against us if we start bringing suits in Texas. So you know what? We don't want to enforce our patents there. And therefore, under ACRO and under Advocent, where you look for enforcement-related obligations in the forum, not just in gross, but in the forum, Section 8.1 gives Ford Global all sorts of discretion to decide that it does not want to enforce its patents in suit in Texas, particularly when it can enforce its patents anywhere that the products are being sold. Well, if that's true, it really does seem to suggest to me that this really isn't an exclusive license, notwithstanding the name, and notwithstanding Judge Lin's characterization of it as an exclusive license. Because if Ford can freely indulge infringement, then it has complete authority, in effect, to create licensees in everything except name. So two parts to that, Your Honor. First, I'd agree that this is- And what? Certainly, I would agree that exclusive is said in many ways, I think, in this Court's case law. And the exclusiveness that's mentioned in ACRO, for instance, is does it bar Ford Global from giving a license to New World? Yes, it's exclusive in that sense, because if New World comes and says, can we license the patent? We can say, no, you can't because we've promised LKQ. But it's not exclusive in the sense that, which you see in a lot of the other cases, like Breckenridge, like Genetic Implant, where essentially the licensor and licensee have joined together in business to develop the market for the product, to go out and defend and enforce patent infringement suits together. In fact, what this license does is it creates two separate, yet equally important areas of the license. Patent enforcement and defense rests pretty much entirely with Ford Global. And on the other side, marketing and sales rests entirely with LKQ. Ford Global doesn't have any control over that or power over that. So this is a more arm's length relationship than we see in all the other cases. So whether you attach the label of exclusive to it, what Breckenridge says is you look closely at the language of the agreement. All patent licensing agreements differ. And this is one in which you don't have that close relationship, which is what Judge Lynn was talking about below in her decision. Well, there is some control by Ford, I guess, over the manufacturing and distribution process, right? In Section 10.1? So Section 10.1, and some of this is under seal, so I'm going to be careful about how I say it. The word manufacturing... Right, whoa, whoa, it's under seal. Oh, sorry. Some of the particular, like, five words in it. I just want to be careful. Right, but I don't think this is part of it. Right. So just to say that... The only, let me be sure I understand this. The only things that are confidential are the ones that are highlighted in the briefcase. Yes, exactly. Very little. Right, it's just a couple words, but they're in 10.1, so I want to be careful about how I say that. Okay. The word manufacturer that is used in 10.1 is not all manufacturers. It's a defined term in the license and refers to the manufacturers that are being used to produce these parts. So it's not as if there's an obligation on LKQ to stop infringement by anyone in the world. Manufacture is a defined term and it doesn't carry its generic sense, which I think is what New World is claiming. But also I'd point out, Section 10.1 was never brought up until the reconsideration measure, and when Judge Lynn addressed that in her decision on reconsideration, she said, look, you could have brought 10.1 to me sooner. You didn't do it and I'm not going to consider it at this point. And that was perfectly within her discretion. And that's part of what happened in this case is that every time an argument was rejected, New World came back and said, well, how about this instead? Was that on reconsideration or was that in connection with the motion to amend? So 10.1 was on reconsideration. The extrajudicial patent enforcement claims, which is essentially you're calling our suppliers, in this case, that was on amendment. And they're two separate things, so they sort of traveled hand in hand in the sense that Judge Lynn said, look, this has been on my docket for four months. You've gone through dozens of docket entries on this. At some point, this just has to stop. I'm not going to forever keep entertaining new theories of personal jurisdiction over Ford Global. Because that gets to, I think, the point you were talking about in closing, which is these claims could be brought in the Eastern District of Michigan. Ford Global agrees it is subject to general jurisdiction there and they can be resolved as part of the other cases. No, but plaintiffs feel ardently about Venue. They do feel ardently about Venue in the sense that they filed a suit in the Eastern District of Texas. They was transferred. It got, you know, they tried to mandamus it. They lost. They petitioned for certiorari. They lost. They then filed a second suit in the Eastern District of Texas, but didn't serve it when they drew the first judge. And then only then- Was that Judge Mazant? I believe that's right, Your Honor. And then they filed the third suit in the Northern District of Texas when that didn't work out, trying a different theory. And yet after this was dismissed, they filed a fourth suit in the Northern District of Texas, trying to reassert the claims that Judge Lynn found waived. So, I mean, they do feel very ardently about Venue, but I think what's important about this case, and it's different than Zillnick's is, this isn't about, you know, can they bring their claim in the United States? It's where they bring their claim in the United States. And they have a ready forum in the Eastern District of Michigan. And there's no reason to expand this court's cases past what is already said to allow a claim that has a ready, and I think quite able forum for the resolution of what my friend talks about, which is, are these divine patents valid and enforceable? We're happy to litigate those claims. We just don't, they just shouldn't be litigated in Texas in this case. Unless the court has further questions, we'd ask that you refer them. So, this court has focused in on Breckenridge. And let me just say that the, I think you have to step back, and the court addressed whether this license agreement was exclusive. This license agreement is exclusive as far as my client is concerned, because my client attempted to get a license from Ford Global, and that letter is in the file, I believe, Appendix 60, which was refused. And in the ACRO case, I think that the compelling statement is that when you have an exclusive license agreement that has been entered into by somebody who is doing business in the forum, that is excluding everybody else. That has excluded my client. And that is really what, one of the things that gave rise to this case. Well, only if the patentee elects to exercise its right to exclude. But if the patentee decides to indulge infringement, then you're free to go about your business. Well, but I believe under the terms of this license agreement, Ford Global was not allowed contractually to enter into... Not enter into an agreement, but it was allowed to decide not to sue for infringement, subject to the reasonableness clause. Right, which... So any commercially reasonable basis, such as we don't like to spend a lot of money on infringement suits. Which, of course, reasonableness is a legally enforceable concept in the state of Michigan, as I indicated in the brief. And I think that's the same relative standard that the licensor was subject to in the Breckenridge case. So the key is when you look at the exclusive... And the whole purpose of an exclusive license agreement is to exclude other people. And that's why you do have the provisions in the agreement on enforcement. Because without these clauses, then, of course, the exclusive license agreement is meaningful. Of course, we also have the indemnification provision, which was an important provision in the genetic implant case. And that's further evidence of a continuing obligation between the licensor and the licensee that we believe falls within this line of cases. On the motions for leave, yes, this has been a very procedurally complex case. We certainly have our side of the story on everything that's happened, which I don't think is particularly relevant to this case. It would take a long time to explain. But the matters in the amended pleading, we believe also go to enforcement and defense and would support the ruling, particularly in the Xilinx case for personal jurisdiction. Thank you. We thank both sides. And the case is submitted.